UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| BRENDA J. NISSEN, and THOMAS NISSEN, | ) ) ) | CIV. 09-4166-KES |
| Plaintiffs, | ) ) | ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| vs. | ) ) | |
| MATTHEW R. JOHNSON, M.D., M.P.H., | ) ) ) | |
| Defendant. | ) ) | |

Plaintiffs, Brenda J. Nissen and Thomas Nissen, brought suit against defendant, Dr. Matthew R. Johnson, M.D., M.P.H., alleging a medical malpractice cause of action. Thomas also claims loss of consortium. The Nissens seek compensatory and punitive damages. Dr. Johnson moves for partial summary judgment on the Nissens' request for punitive damages. The Nissens resist the motion. The motion is granted.

**BACKGROUND**

The pertinent facts to this motion, in the light most favorable to the Nissens, the nonmoving party, are as follows:

For about a year before Brenda first saw Dr. Johnson, she experienced significant pain in her left arm and neck. Due to her pain, Brenda was unable to complete all of her job tasks as a practical nurse at a hospital. Beginning in September of 2007, Brenda's pain worsened. Brenda consulted her family

physician, Dr. Lindau, regarding the pain. Dr. Lindau suggested pain medications, steroids, and physical therapy as treatment plans. When those treatments failed to alleviate her pain, Brenda underwent a magnetic resonance imaging test (MRI) in November of 2007. In January of 2007, Dr. Lindau referred her to Dr. Johnson at the CNOS Clinic in Dakota Dunes, South Dakota.

On January 23, 2008, Dr. Johnson saw Brenda and recommended that she undergo a posterior foraminotomy and microdiscectomy on the C6 and C7 levels of her cervical spine. Dr. Johnson performed the surgery on February 7, 2008.

After Brenda awoke from the anesthesia used during the surgery, she experienced severe pain in her right arm that began in her shoulder and extended to the tips of her fourth and fifth fingers. Brenda immediately complained to the nurses about her pain. She rated the pain as a five or a six on a ten-point pain rating scale and described that it felt like she was holding on to an electric fence.

The nurses wheeled Brenda, who was still on her recovery bed, to the "step-down" (i.e., recovery) room, sat Brenda up, and moved her to a chair. During this move, the nurses noticed that the back of Brenda's neck was unusually swollen, and they seemed alarmed about this swelling. The nurses called Dr. Johnson about the swelling and the pain in Brenda's right arm.

Dr. Johnson did not examine Brenda and did not ask one of his colleagues to follow up with her. Instead, Dr. Johnson told the nurses to use an ice pack for the swelling, provide Brenda with a pillow to elevate her right arm, and offer her pain medication.

When the pain did not subside, the nurses again called Dr. Johnson, who told the nurses to offer Brenda pain medication and then to discharge her. Brenda took pain and anti-nausea medication and then left CNOS about two hours after her surgery.

Brenda continued to experience severe pain and sensitivity to touch and air in her right arm. Brenda saw Dr. Johnson on February 11, 2008. Dr. Johnson believed that Brenda was suffering from a pinched ulnar never in her forearm and he prescribed anti-inflammatory medications and ice packs.

Brenda saw Dr. Johnson again on March 3, 2008. During that appointment, Dr. Johnson again told Brenda that she was suffering from a pinched ulnar nerve. He ordered an electromyogram (EMG). Dr. Pary, a CNOS physician, completed the EMG with Brenda on March 19. Dr. Johnson called Brenda after the EMG and said that she needed to have an MRI.

On March 31, 2008, Brenda had an MRI and then met with Dr. Johnson. Dr. Johnson appeared anxious when discussing the MRI's results with her. Dr. Johnson told Brenda that something showed on her spinal cord that he could not repair with surgery. Dr. Johnson did not prescribe any new pain

medications to Brenda because he had already prescribed neurontin and lyrica, which Brenda could not tolerate due to significant side effects of dizziness, sleepiness, and vertigo. Additionally, the medications did not decrease her pain. Dr. Johnson recommended that she see Dr. Pary to determine if a disease process had caused the problem with her spine.

After observing Dr. Johnson's demeanor on March 31, Brenda felt that Dr. Johnson was not telling her the truth. Brenda discontinued treatment at CNOS. In June of 2008, Brenda saw Dr. Longley at the Nebraska Spine Center in Omaha, Nebraska. Brenda chose to see Dr. Longley because he had previously successfully completed surgery on Brenda's son.

After reviewing Brenda's medical records, Dr. Longley told Brenda that she had a spinal cord injury that was caused by the February 7 surgery, which would not get worse but would not get better. Brenda received a referral from Dr. Longley's office to Dr. Angela Rakes, a pain doctor, in Omaha. By the time Brenda saw Dr. Rakes, she rated her pain between a six and an eight on a ten-point pain scale.

Brenda continues to have pain and numbness in her right arm. She keeps her right arm covered because her arm hurts more when the air touches her skin. Pain medications do not decrease her pain but do improve her mood. She uses a topical anesthetic if she travels longer than an hour in the car

because the anesthetic allows her to lay her arm on something, but it does not decrease her pain.

In April of 2008, Brenda returned to work. While she is scheduled to work 72 to 80 hours each pay period, Brenda usually does not work full time because her pain interferes with her ability to work. Brenda is no longer able to work with patients and, instead, she does paperwork.

In their complaint, the Nissens request punitive damages in Brenda's medical malpractice claim's prayer for relief: "WHEREFORE Plaintiff Brenda Nissen prays that she have and recover judgment against Defendants for all damages incurred, including, but not limited to the following: . . . If warranted under South Dakota law, for punitive damages against Defendants . . . ." Docket 1 at 3. In his loss of consortium claim, Thomas seeks relief "in an amount that will fairly and reasonably compensate Plaintiffs for their injuries and damages, and for punitive damages in an amount sufficient to punish the Defendant and deter like conduct . . . ." Docket 1 at 4.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Only disputes over facts that might affect the outcome of the case will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is inappropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court views the facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal citation omitted). The nonmoving party also receives "the benefit of all reasonable inferences to be drawn from the underlying facts" in the record. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

## DISCUSSION

Dr. Johnson argues that the Nissens did not sufficiently plead their punitive damages requests in the complaint and their punitive damages claims fail as a matter of law. Because the Nissens' punitive damages requests fail on the merits, the court will address Dr. Johnson's substantive, and not his procedural, challenges. *See Foman v. Davis*, 371 U.S. 178, 181-82 (1962) ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principles that the purpose of pleading is to facilitate a proper decision on the merits."

(quotation omitted)); *United States v. Empire Gas Corp.*, 393 F. Supp. 903, 912 (D.C. Mo. 1975) (reasoning that "cases should be decided on the merits rather than on procedural grounds . . . .").

Dr. Johnson contends that the Nissens have not offered sufficient evidence to show that he acted with the requisite mental state to support their punitive damages claims. South Dakota allows plaintiffs, in certain circumstances, to recover punitive damages. *Dahl v. Sittner*, 474 N.W.2d 897, 900 (S.D. 1991). Under SDCL 21-3-2, a plaintiff claiming punitive damages must show that "the defendant has been guilty of oppression, fraud, or malice, actual or presumed." If the plaintiff makes this showing, "the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant." SDCL 21-3-2. To survive summary judgment, a plaintiff must prove to the court by a clear and convincing evidence standard that a reasonable basis exists upon which a jury could award punitive damages. *Dahl*, 474 N.W.2d at 902 (citing *Flockhart v. Wyant*, 467 N.W.2d 473, 475 (S.D. 1991)).

On a malice theory, which the Nissens appear to allege as the basis for their punitive damages requests,[1] the Nissens must show that Dr. Johnson acted with "either actual, malice in fact, or presumed, legal malice." *Id.* at 900.

---

[1] The Nissens do not clarify whether oppression, fraud, or malice is the basis for either Brenda's or Thomas's punitive damages requests. But in their brief in opposition to Dr. Johnson's summary judgment motion, the Nissens discussed the malice theory for their punitive damages requests.

7

"Actual malice is a positive state of mind, evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will towards that person." *Id.* (citing *Gamble v. Keyes*, 178 N.W. 870, 872 (S.D. 1920)). "Presumed, legal malice, on the other hand, is malice which the law infers from or imputes to certain acts." *Id.* (citing *Hannahs v. Noah*, 158 N.W.2d 678, 682 (S.D. 1968)).

An inference of presumed malice may be made when the person acts willfully or wantonly and injures another. *Id.* In *Berry v. Risdall*, 576 N.W.2d 1 (S.D. 1998), the South Dakota Supreme Court announced the standard for willful and wanton misconduct:

> "It is conduct which partakes to some appreciable extent, though not entirely, of the nature of a deliberate and intentional wrong. There must be facts that would show that defendant intentionally did something . . . which he should not have done or intentionally failed to do something which he should have done under the circumstances that it can be said that he consciously realized that his conduct would in all probability, as distinguished from possibility, produce the precise result which it did produce and would bring harm to the plaintiff. Willful and wanton misconduct demonstrates an affirmative, reckless state of mind or deliberate recklessness on the part of the defendant. Such state of mind is determined by an objective standard rather than the subjective state of mind of the defendant."

*Id.* at 9 (quoting *Tranby v. Brodock*, 348 N.W.2d 458, 461 (S.D. 1984)). *See also DeNeui v. Wellman*, No. 07-cv-4172, 2009 WL 4847086, at *7 (D.S.D. Dec. 9, 2009) (applying the *Berry* standard in a violation of informed consent case); *Benson v. Giordano*, No. 05-cv-4088, 2008 WL 2390835, at *3 (D.S.D. June 8, 2008) (granting a summary judgment motion on punitive damages claims

because "South Dakota requires . . . proof of conduct more egregious than gross negligence . . . ." (internal quotations omitted)).

The Nissens offer the testimony and report of their expert, Dr. Patrick Bowman,[2] to meet their burden of proof. Dr. Bowman testified that Dr. Johnson's actions before Brenda's surgery amounted to malpractice because he "hastily" arrived at the decision that Brenda needed surgery and ignored Brenda's unique medical conditions that should have led Dr. Johnson to choose a different surgery. Docket 44-1 at 24-25, 31-32; *see also* Docket 44-1 at 56-57 (containing the same observations in Dr. Bowman's expert report).

Dr. Bowman further testified that Brenda's injury was the result of trauma caused by a sharp object during surgery. He theorized that Dr. Johnson penetrated Brenda's spinal cord with the guide pin that he used during her surgery. Docket 44-1 at 20, 23; *see also* Docket 44-1 at 26 ("[T]he lesion in the spinal cord is consistent with sharp trauma and the other details of the case are consistent with it happening intraoperatively."). Dr. Bowman stated that Dr. Johnson committed malpractice by failing to use intraoperative neuromonitoring, and if he "had been using intraoperative monitoring . . . this whole post-op unfortunate series of events would not have occurred. He would

---

[2] Dr. Johnson argues that Dr. Bowman's expert report is inadmissible under Federal Rule of Evidence 702 because Dr. Bowman reviewed neither Brenda's nor Dr. Johnson's depositions before authoring his report. Docket 45 at 5. For purposes of this motion, however, the court assumes that Dr. Bowman's report and testimony is admissible.

9

have known it right there on the table . . . he would not have lacerated the spinal cord." Docket 44-1 at 25.

Assuming as true, as the court must at the summary judgment stage, that Dr. Johnson hastily recommended surgery, chose the incorrect surgical procedure, should have but failed to use intraoperative monitoring, and lacerated Brenda's spine with a sharp object, a jury could find that these actions violated the standard of care that Dr. Johnson should have used. But the Nissens have not offered any evidence that Dr. Johnson, through these actions, intentionally acted and consciously realized that his conduct would, in all probability, produce the precise result of pain and numbness that Brenda currently experiences in her right arm. The Nissens have not shown that Dr. Johnson acted with malice.

The Nissens further argue that Dr. Johnson acted recklessly in providing for her immediate post-operative care. When Brenda was in the recovery room, the nurses paged Dr. Johnson two times to inform him of the unusual swelling in Brenda's neck and the pain and tingling in her right arm. Dr. Johnson did not examine Brenda and did not ask one of his colleagues to examine her. Instead, Dr. Johnson ordered ice packs for the swelling and a pillow to elevate Brenda's arm, and he prescribed pain medication. Dr. Bowman testified that Dr. Johnson acted carelessly, even callously, in not seeing her during the recovery time but admitted that he could not definitively say whether

Dr. Johnson could have alleviated Brenda's injury had he examined her in the recovery room:

> A: He needed to see that patient. *It may not have made a difference to her neurological injury in the long run*, but it certainly speaks to the level of carelessness and, quite frankly, a possible callousness to get that kind of call and tell the patient to be released to home. To me, this is shocking. She could have – he should have come to see that patient or had one of his colleagues see that patient, no question about it. . . . [I]t's just basically the idea of not having a doctor in your hour of need. . . . This rush to surgery, the lack of appropriate response to her new severe symptoms in the recovery room as well as sending her home immediately without appropriate evaluation all combined to produce a picture of clinical practice which is reckless and clearly falls below the standard of care.
>
> Q: But you would agree that it more likely than not would not have made any difference in the long run?
>
> A: No, I don't know that it would or not have. I have no opinion. *I think it probably wouldn't have*, it's just basically the idea of not having a doctor in your hour of need.

Docket 44-1 at 31-32 (emphasis added). The Nissens offer no evidence that had Dr. Johnson visited her in the recovery room at CNOS when the nurses paged him, that Brenda would not have been injured or would not have been injured to the extent she currently is injured.

The court agrees with the Nissens and Dr. Bowman that Dr. Johnson's failure to visit Brenda in her recovery room calls into question the concern that he, as a doctor, should have exhibited in caring for Brenda. But the Nissens are suing Dr. Johnson to recover damages resulting from the injury to Brenda's arm. The Nissens have not proffered evidence showing a link between

11

Dr. Johnson's failure to check on her while she was recovering and the injury to Brenda's arm. Thus, summary judgment is granted on the Nissens' punitive damages requests.

## CONCLUSION

Dr. Johnson moves for summary judgment on the Nissens' requests for punitive damages. Summary judgment is granted on the Nissens' punitive damages requests because they failed to meet their burden of proof to show a reasonable basis exists for a jury to award punitive damages. Accordingly, it is

ORDERED that defendant's motion for partial summary judgment on punitive damages (Docket 35) is granted.

Dated October 12, 2011.

                            BY THE COURT:

                            /s/ *Karen E. Schreier*
                            KAREN E. SCHREIER
                            CHIEF JUDGE